Diana CORTO, Appellant,

v.

NATIONAL SCENERY STUDIOS,
INC., et al., Appellees.

Nos. 92–CV–558, 92–CV–
559 and 94–CV–212.

District of Columbia Court of Appeals.

Argued Oct. 8, 1996.

Decided Sept. 22, 1997.

Frederic W. Schwartz, Jr., Washington, DC, for appellant.

Neil D. Goldman, Alexandria, VA, with whom John Baker McClanahan, Jr., Richmond, VA, was on the brief, for appellee, National Scenery Studios, Inc.

David H. Coburn, Washington, DC, for appellees Theater Now, Inc. and Ralph Roseman.

Frances C. DeLaurentis, with whom James F. Hibey, Washington, DC, was on the brief, for appellee/garnishee, The John F. Kennedy Center for the Performing Arts.

Before FERREN, STEADMAN and RUIZ, JJ.

RUIZ, Associate Judge:

This case arises from an unsuccessful run of *West Side Story,* produced by Diana Corto, which appeared in the John F. Kennedy Center for the Performing Arts ("Kennedy Center") in 1985. Diana Corto appeals from the judgment of the Superior Court awarding more than $300,000 to National Scenery Studios, Inc. ("National"), Theater Now, Inc. and Ralph Roseman (collectively "Theater Now"), and the Kennedy Center.[1] Corto appeals on

---

1. The judgment entered by the Superior Court awarded National $18,500.00, plus interest of 6%

a number of grounds. We affirm.[2]

## I.

The Kennedy Center entered into a contract in July 1985 with West Productions Limited Partnership ("West Productions") and the "producer or presenter of the musical West Side Story" for the production of the musical at the Kennedy Center. West Productions is one of the trade names used by Corto; the contract was signed by Corto.[3] The contract provided that "all expenses incurred by the Kennedy Center directly or indirectly as a result of, or partially as a result of [West Productions'] use of [the Kennedy Center]," other than those expressly specified as the responsibility of the Kennedy Center, "shall be paid by [West Productions]."[4] The contract provided for compensation in the form of a share of box office receipts.

Corto contracted with Theater Now, a corporation that provides general management services to stage productions, to be her management company. Theater Now, represented by Ralph Roseman, its general manager, negotiated a contract with National on behalf of West Productions, to build a deck for the sets of *West Side Story*. Corto signed the contract on behalf of West Productions. Under the contract National was to be paid $18,500 upon completion of the deck. National performed under the contract and was tendered a check in that amount by Theater Now. National twice presented the check for payment; it was returned both times due to insufficient funds.

## II.

A chronology of the intricate procedural history of this case is necessary to understand the issues on appeal. The litigation began on September 20, 1985, when National sued Corto individually (trading as West Productions and West Side Story) and as a partner of West Productions; Theater Now; and Ralph Roseman, for the $18,500 due for the deck. Theater Now and Ralph Roseman settled with National[5] and cross-claimed against Corto to recover, pursuant to their management contract, attorney's fees and costs connected to the litigation. Corto cross-claimed that she had not authorized the contract with National and that Theater Now and Ralph Roseman should indemnify her for her damages, including any amount she may have to pay to National.

To ensure recovery, National had sought to attach cash, credits and property belonging to Corto and her various trade names in the amount of $18,500. National posted a bond for twice that amount with the Superior Court. D.C.Code § 16–501(e) (1996). A writ of attachment was issued by the Superior Court and served on the Kennedy Center as garnishee. The writ provided that any property or credits belonging to Corto which were in the possession of the Kennedy Center were seized by the writ of attachment

from September 3, 1985, plus attorneys' fees of $53,502.16; awarded Theater Now attorney's fees and costs of $29,421.28; and $235,350.74 for attorney's fees and other expenses incurred by the Kennedy Center as garnishee. The trial court also entered a judgment of condemnation on $13,202.15 in box office receipts owed by the Kennedy Center under the production contract with West Productions Limited Partnership, which were being held by the Kennedy Center as garnishee. Corto was afforded a credit in this amount.

2. There are two pending motions on appeal, which we dispose of as follows: appellees' joint Motion to Resubmit Briefs Containing Appendix References is granted; we need not decide Corto's Motion to Resolve Content of Record in light of our disposition on the issue to which it is relevant, the effectiveness of the writ of attachment, see *infra*.

3. According to Corto's answer to interrogatories, West Productions was never formed as a separate legal entity.

4. The trial court made the award to the Kennedy Center under the above-quoted contractual provision for attorney's fees and costs incurred by the Kennedy Center as a result of the attachment of the property used by the producer at the Kennedy Center.

5. On September 27, 1990, Theater Now and Ralph Roseman entered into a Settlement Agreement and Covenant Not to Sue with National. No money was paid to National under the settlement. All parties agreed that settlement had no effect on their claims against other parties in the litigation, and specifically retained the parties' rights to claim against Corto.

and that the Kennedy Center was to retain control over all the property used in the production of *West Side Story.* Corto counterclaimed against National for abuse of process, claiming that in pursuit of the unpaid debt of $18,500, National had caused the attachment of property in excess of that amount. As a result of National's writ, the Kennedy Center inventoried and stored Corto's property related to the production of *West Side Story* for a number of years and engaged counsel to represent it in connection with the present proceedings. Although Corto had the right to challenge National's writ of attachment in the Superior Court, D.C.Code § 16–506, she did not do so at that time.

In October 1985, a month after National sued her, Corto, individually and under her various trade names, filed a bankruptcy petition with the United States Bankruptcy Court for the Southern District of New York seeking relief under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 301 (1994). This filing stayed National's lawsuit against Corto. 11 U.S.C. § 362 (1994). This first bankruptcy petition was dismissed almost two years later. Upon dismissal of the bankruptcy petition, Corto retained counsel and filed an answer to the suit pending in Superior Court.

The case was first scheduled to come to trial before Judge Rufus King on March 16, 1990. On March 1, 1990, Corto filed a motion for a continuance, which was granted. Trial was rescheduled to begin on June 11, 1990; however, Corto filed a second motion for continuance, and trial was continued until August 13, 1990, with the court's warning that it would not grant any further requests for continuance. Nevertheless, on August 2, 1990, Corto filed her third motion for a continuance seeking to postpone the August trial date. Although the trial judge found that the motion did not cite any grounds which would persuade the court to further delay the trial date, the case was continued, due to the court's own schedule, to begin on January 7, 1991. After this rescheduling, Corto moved for the recusal of Judge King alleging bias. The recusal motion was denied. Due to amendments to the Superior Court's Rules of Procedure, however, the case was once

again rescheduled to begin on June 10, 1991, this time before Judge Colleen Kollar–Kotelly. This was the fifth trial date scheduled for the case. Corto then filed a "Petition For a Stay of Proceedings in the Trial Court" which was considered by the court as another motion for a continuance. This motion was denied.

On June 10, 1991, all parties except Corto appeared for trial. On that same morning, Corto faxed to the trial judge a copy of an unsigned Chapter 13 Voluntary Petition in Bankruptcy (Corto's second bankruptcy petition) filed in the United States Bankruptcy Court for the Western District of New York. As a result of the automatic stay provisions of 11 U.S.C. § 362, the trial was not held. This second bankruptcy petition was dismissed on Corto's motion on July 22, 1991, and the sixth trial date was then set for August 26, 1991. Corto sought to have Judge Kollar–Kotelly recused for bias and to once again postpone the trial date. These motions were denied. All parties were once again ready for trial on August 26, 1991, except for Corto. Corto filed another bankruptcy petition (her third) in the Western District of New York, which, again, stayed the proceedings in the trial court.

On October 4, 1991, the United States Bankruptcy Court for the Western District of New York dismissed Corto's third bankruptcy petition, finding that Corto had failed to prosecute her Chapter 13 plan by willfully failing to comply with orders issued by the bankruptcy court. Trial in the Superior Court was then, for the seventh time, rescheduled to begin on January 13, 1992. Corto informed the court on January 10 that she had not received notice of the January 13 trial date and that she would be unable to appear on that date due to claimed conflicts. Although she was then informed that the trial was still scheduled to proceed on January 13, 1992, Corto did not appear for trial.

On January 13, 1992, the trial court was notified by fax that Corto's mother and son had on that same day filed an involuntary petition for bankruptcy against Corto in the United States Bankruptcy Court for the Western District of New York. When notified of the petition, the court left messages for

Corto on her answering machine to call immediately. The phone calls were not returned. After considering the involuntary petition filed by Corto's mother and son, and the bankruptcy court's October 4, 1991, order dismissing Corto's third bankruptcy petition, the trial court determined that the automatic stay provision of the Bankruptcy Code was "inapplicable" to the current proceedings because the involuntary bankruptcy filing contravened the bankruptcy court's order prohibiting Corto from becoming a debtor under Title 11 of the United States Code for a period of 180 days.[6] In making its decision, the trial court also considered Corto's failure to request a continuance for the last trial date, her failure to respond to the court's messages left on her answering machine, her purposeful and repeated delays to avoid trial and her faxing of bankruptcy petitions on the same day of trial on two prior occasions. Corto's sister, Ms. Margaret Pesta, also telephoned the court on the same date to inform the court that Corto was ill. The court however, deemed Corto's sister's phone call as not credible and insufficient to warrant a continuance. The case proceeded to trial without Corto.

National requested that the bankruptcy court dismiss the involuntary petition filed by Corto's mother and son. Two months after trial, in an order dated March 25, 1992, the bankruptcy court noted that the three bankruptcy petitions filed by Corto, had "been filed for the sole purpose of preventing trial from going forward in the case of [National]." Although the bankruptcy court did not, at that time,[7] dismiss the involuntary petition because Corto's mother had been unavailable to appear at a hearing for medical reasons, the court ordered that "any automatic stay

which arguably may have arisen pursuant to 11 U.S.C. § 362 upon the purported filing of the instant petition is hereby lifted *nunc pro tunc* as of January 13, 1992." It also ruled that any and all actions taken by the Superior Court of the District of Columbia with regard to the present case since October 4, 1991, "were unaffected by any bankruptcy stay." Corto appealed the bankruptcy court's order to the United States District Court for the Western District of New York, which affirmed. Corto also appealed to the United States Court of Appeals for the Second Circuit which *sua sponte* dismissed the appeal stating that it was "frivolous" within the meaning of 28 U.S.C. § 1915(d).

On March 26, 1992, the day after the bankruptcy court's order lifting the stay *nunc pro tunc* to January 13, 1992, the Superior Court entered the judgment in favor of National, Theater Now, Ralph Roseman and the Kennedy Center, from which Corto now appeals.

### III.

Corto raises numerous issues on appeal, none of which warrants reversal. We address each in turn.

*Automatic bankruptcy stay*

Corto's threshold issue is whether the trial held on January 13, 1992, should have been stayed in light of the pending involuntary bankruptcy petition filed against her by her mother and son. After reviewing the involuntary petition filed by Corto's mother and son on the day of trial and the bankruptcy court's October 4, 1991, order dismissing Corto's Chapter 13 petition which prohibited Corto from becoming a debtor in bankruptcy for a period of 180 days, the trial court

---

6. The Bankruptcy Court's order dated October 4, 1991, stated that the case was "dismissed with prejudice to debtor filing a future petition under Title 11 U.S.C. for the period of 180 days from the date entry of hereof."

The order dismissed Corto's petition partly based on 11 U.S.C. § 109(g)(1) for failure to properly prosecute her bankruptcy filing. This code section states in relevant part:
(g) Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—

(1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case;

"Debtor" is defined under 11 U.S.C. § 101(13) to mean anyone who is the subject of a bankruptcy filing under this title. The definition does not distinguish between a voluntary and an involuntary debtor.

7. On January 13, 1993, the bankruptcy court dismissed the involuntary petition filed by Corto's mother and son on the day of trial, finding that it was "collusive and filed in bad faith."

concluded that a stay resulting from the involuntary petition was inapplicable. Corto argues that the trial court did not have authority to proceed in the face of the automatic stay created by the involuntary bankruptcy petition or to determine the petition's validity.

The filing of a bankruptcy petition acts as an automatic stay of all judicial proceedings pending against the debtor. 11 U.S.C. § 362(a) (1994). Although the trial court is not free to ignore the automatic stay provisions of the Bankruptcy Code, or to evaluate the validity of a bankruptcy petition that would trigger a stay,[8] we conclude that Corto is estopped from making these arguments. As the bankruptcy court found, Corto's bankruptcy petitions were filed "for the sole purpose of preventing trial from going forward" in the present case and the involuntary petition filed by her mother and son was "collusive and in bad faith." Corto correctly notes that the trial court did not have the benefit of these findings when it decided to proceed to trial; but we do in considering this appeal. Therefore, even though Corto also correctly asserts that the trial court violated the automatic stay, Corto's bad faith abuse of the bankruptcy process estops her from asserting on appeal the automatic stay provisions of the Bankruptcy Code. *See Williams v. Gerstenfeld*, 514 A.2d 1172, 1178–79 (D.C.1986) (recognizing that bankruptcy courts have held that "the filing of successive petitions with the clear intent of forestalling [a proceeding] constitutes bad faith.") (citations omitted).

Furthermore, the bankruptcy court subsequently lifted, as to National, the automatic stay created by the involuntary bankruptcy petition against Corto *nunc pro tunc* to January 13, 1992, and declared that any actions taken by the trial court since October 4, 1991, were unaffected by any bankruptcy stay. *See Wisconsin Ave. Assocs. v. 2720 Wisconsin Ave., Co-op. Ass'n*, 441 A.2d 956,

962 (D.C.1982) (noting facts similar to this case, court entered order and final judgment after litigant filed bankruptcy petition. Bankruptcy Court subsequently lifted stay because petition had been filed for purpose of delaying court proceeding), *cert. denied*, 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982). The bankruptcy court's order was affirmed by the United States District Court for the Western District of New York and Corto's appeal was dismissed by the United States Court of Appeals for the Second Circuit.

*Writ of attachment*

The trial court found that valid grounds existed for the issuance of a writ of attachment before judgment under D.C.Code § 16–501(d)(1), because Corto was not a resident of the District of Columbia, and under § 16–501(d)(3), because Corto was endeavoring to remove her property from the District. Corto does not dispute these findings. Corto claims, however, that the writ of attachment served on the Kennedy Center was ineffective because National failed to file a notarized affidavit, as required by D.C.Code § 16–501, and to have the U.S. Marshal properly attach the production property at the Kennedy Center, as required by § 16–509. Corto also claims that service on her attorney did not constitute proper service of the writ on her.

Corto's challenges to the attachment are not properly before us because they were not timely raised before the trial court.[9] As a general rule we will not review matters not asserted at trial. *See Williams, supra*, 514 A.2d at 1177. Corto did not move to quash the attachment and did not avail herself of any of the other statutory remedies to challenge an attachment set forth in D.C.Code § 16–501 et seq. *See also Metro Rentals, Inc. v. Wagner*, 435 A.2d 1072, 1074 (D.C. 1981) (holding that trial court did not err in denying appellant's motion to quash writ of attachment because appellant did not argue that appellee's writ was deficient or claim

---

8. *See Powell v. Washington Land Co.*, 684 A.2d 769, 773 & n. 10 (D.C.1996).

9. Corto argues that she raised the writ's defects before the trial court in two ways: in a "Motion to Release Wages and Property in Excess of $18,500" and in her counterclaim against National which also challenged the attachment as excessive. Neither the motion nor the counterclaim made the argument that Corto is making in this appeal, that the writ was ineffective because it did not comport with statutory requirements.

unfounded). Consequently, we agree with the trial court's conclusion that Corto cannot raise claims she may have made at the time of attachment in 1985 or during the seven years leading up to trial. In light of the bankruptcy court's determination that Corto's bankruptcy filings were for the purpose of delay, Corto may not rely on the automatic stays from those fraudulent filings to excuse her failure to assert her claims against the attachment.[10]

*Counterclaim against National*

On September 19, 1988, Corto sought permission from the trial court under Rule 13(b) of the Superior Court Rules of Civil Procedure to file a permissive counterclaim against National alleging that National engaged in abuse of process when it attached property having a value of more than $18,500, the amount National claimed it was owed. On January 20, 1991, the trial court concluded, as a matter of law, that if Corto were permitted to then file the counterclaim, her claim for abuse of process would be barred by the three-year statute of limitations, and granted summary judgment to National on Corto's counterclaim.[11] Corto contends that the trial court erred because her filing of the motion to submit the counterclaim two days before the limitations period expired tolled the statute of limitations.

■ We do not reach the merits of Corto's argument because we conclude that Corto's counterclaim that the value of the property attached exceeded National's claim would necessarily fail in light of the trial court's finding that the value of the box office receipts and production property held by the Kennedy Center did not exceed $18,500.[12] Therefore, even assuming the counterclaim was timely, because the factual foundation for the counterclaim—that the property attached was worth more than $18,500—is incorrect, National was entitled to summary judgment.

■ Corto also argues that her counterclaim against National should have been permitted because it would have been available in recoupment notwithstanding the running of the statute of limitations, citing *Sears, Roebuck & Co. v. Goudie*, 290 A.2d 826 (D.C. 1972), *cert. denied*, 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972). *Sears* does not provide the support Corto seeks. The only way recoupment can be had is by a "legal or equitable right resulting from a counterclaim

10. Appellees argue that Corto's claim concerning the writ of attachment is moot because the remedy to which Corto would be entitled if she prevailed, dissolution of the attachment lien, was in fact accomplished when the subject property was returned to Corto in 1992 after it could not be sold at auction. *See* note 11 *infra*. Although we agree that the property that was subject to the writ can no longer be affected by a ruling of this court, we cannot conclude that the issue is necessarily moot, however, in light of Corto's claim that the property was more valuable at the time it was attached in 1985 as part of an ongoing production than when it was offered at auction in 1992 because, but for the attachment, Corto could have continued with the production of *West Side Story*. Also, it may be that the Kennedy Center's claim against Corto for expenses and fees it incurred in responding to the writ of attachment could be affected if the writ had been improperly issued.

11. The trial court determined that Corto's cause of action accrued from the date she was made aware that her property was attached, on September 21, 1985.

12. As noted *supra* at note 1, the Kennedy Center held $13,202.15 in box office receipts due to Corto under the production contract with the

Kennedy Center. In 1992, the trial court found that, following attachment of the property in the possession of the Kennedy Center, the property was valued by Roseman at about $800,000, almost all of which did not belong to Corto, but had been rented from other suppliers. The rented property was released from the attachment and returned to the lessors. The only exception were some props and a balcony, "but even the balcony unit would have value only if a production required a balcony unit." *Id.* The trial court found that Corto's property remaining at the Kennedy Center in 1992 "retains little, if any, value; it has been valued at $100." The trial court's finding is fully supported by the record. There was evidence in the record from Roseman and Alan Wasser, General Manager of the Kennedy Center, that the property had no value separate from the failed production. According to them, at that time, the property was worthless and it would be lucky if someone would haul the property away without charge. Following the trial, the marshall advertised the property for auction to satisfy the judgment entered against Corto in favor of National. No bids were received and the property was returned to Corto.

arising out of the same transaction." *Baylor v. Bortolussi,* 194 A.2d 653, 656 (D.C.1963) (quoting *Howard Johnson, Inc. of Florida v. Tucker,* 157 F.2d 959, 961 (5th Cir.1946)). Corto's counterclaim against National does not arise from the same contract giving rise to National's claim against Corto to recover payment due for services performed. Therefore, Corto is precluded from bringing a claim in recoupment against National. *See McGuire v. Gerstley,* 26 App. D.C. 193, 204 (1905), *aff'd on other grounds,* 204 U.S. 489, 27 S.Ct. 332, 51 L.Ed. 581 (1907).

*Third party complaint against the Kennedy Center*

■ The motions court ruled in 1989 that Corto could not sue the Kennedy Center as a third-party defendant. Corto argues that the court erred because, for purposes of the proceeding, the Kennedy Center was acting as a party and the trial court, in its final order entered after trial, considered the Kennedy Center to be a party when it made findings with respect to the Kennedy Center's contractual and garnishee relationships with Corto. We disagree. A proper third-party claim would lie only if Corto claimed that the Kennedy Center was liable to her for the debt she owed to National. Super. Ct. Civ. R. 14(a); *see also Delany v. Murphy,* 338 A.2d 432, 434–35 (D.C.1975) (noting that "if the party sought to be impleaded can only be held liable to the original plaintiff, however, he cannot be brought into the action under Rule 14."). In her third-party complaint Corto did not allege any basis for the Kennedy Center's liability based on her liability to National. Instead, Corto claimed that the Kennedy Center had illegally attached her property and, as a result, converted it. Corto also claimed that the Kennedy Center breached fiduciary and contractual responsibilities. Therefore, there was no basis for a complaint against the Kennedy Center as a third-party defendant. As noted above, to the extent that Corto's claims related to the Kennedy Center's actions as garnishee, Corto did not timely assert her objections in the trial court. To the extent that Corto's claims against the Kennedy Center were based on the production contract, those claims should have been brought either in a separate action or in recoupment at trial.[13] In view of the bankruptcy court's determination that the involuntary petition filed on the day of trial was "collusive and filed in bad faith," Corto cannot claim that she did not have an opportunity, at trial, to assert her contractual claims against the Kennedy Center in mitigation of her liability to the Kennedy Center.

*Wages v. Box Office Receipts*

■ At the time of the attachment, the Kennedy Center had control of $13,202.13 owed to West Productions at the close of the engagement pursuant to the production contract with the Kennedy Center. Corto argues that the trial court erred when it considered and decided that this amount did not constitute wages not subject to attachment. Corto contends that Judge Goodrich had previously found that the amount was her share of the box office receipts and constituted wages which cannot be attached under D.C.Code § 16–572. There is no basis in the record for Corto's assertion that the box office receipts were determined to be wages prior to trial.[14] Judge Kollar-Kotelly found after trial that the box office receipts did not fall within the statutory definition of "wages" because they did not constitute compensation for personal services. D.C.Code § 16–571(1). This finding is supported by the record; there is no evidence in the record that there

---

**13.** The Kennedy Center's proposed Findings of Fact and Conclusions of Law, filed before trial, asserted a contractual basis for the award of attorney's fees and expenses against Corto.

**14.** Corto had filed a "Motion to Release Wages and Property in Excess of $18,500." On October 1, 1987, Judge Goodrich, without addressing the characterization of "wages and property", granted Corto's motion "subject to ex-parte proof of such property held and the establishment of the $18,500.00." Thereafter, Judge Goodrich amended his order to require a full hearing with all parties concerned. This hearing was subsequently held on January 30, 1990, before Judge King. Recognizing that the issue that needed to be decided to rule on the motion was the fundamental question in the lawsuit, the court and all of the parties, including Corto, who was represented by counsel at the time, "agreed to waive a hearing on the merits of Corto's motion and to schedule the trial."

was an employment contract between Corto and the Kennedy Center or that, under the production contract, any wages were to be paid to Corto.

### Standing to assert security interests.

■ In a Motion to Assert a Lien Against Any Monetary Award to [National], filed January 24, 1991, Corto asserted that certain lenders to the production, including her mother and son, had perfected security interests in the chattels attached by National by virtue of their filings with the New York State Office of the Attorney General. There is no evidence in the record of the asserted filings. The purported secured lenders did not appear in Superior court to challenge National's attachment. The trial court ruled that Corto had no standing to assert the absent creditors' perfected security interests against National's claim and could not represent their interests. In the circumstances of this case, we agree. See D.C.Code §§ 16–520, 523 (1997).[15] The secured lenders' interests are not Corto's; indeed, they are contrary to her interest. Moreover, Rules 101(a)(1) and (2) of the Superior Court Rules of Civil Procedure provide that one who is not a licensed attorney cannot prosecute or defend a claim on behalf of another. Since Corto is not an attorney and she was asserting a claim on behalf of third parties, the trial court was correct in holding that she had no standing.[16]

### Indemnification of Theater Now

■ Corto claims that she was not required to indemnify Theater Now for its attorney's fees and costs incurred in connection with National's litigation and that Theater Now is required to indemnify her for

damages resulting from Roseman's issuance of the check that led to National's lawsuit against Corto. The trial court found that Theater Now acted as Corto's agent pursuant to the management contract, which authorized Theater Now to perform duties in furtherance of the agreement with Corto's prior approval. Corto argues that Ralph Roseman conceded that he wrote the check to National for $18,500, and when it was dishonored, he requested that National redeposit it. What Corto's argument ignores is that Roseman also testified that at the time he initially wrote the check, there were sufficient funds in the account. Roseman further testified that he had frequent conversations with Corto regarding the lack of sufficient capital to support the production and that, when Roseman instructed National to redeposit the check, he did so based on Corto's assurances that sufficient funds would be deposited to cover the check. The management agreement provides that "the Producer [Corto] shall indemnify and hold harmless [Theater Now] from and against any and all losses, claims, damages, expenses (including reasonable attorneys' fees) and liabilities ... resulting from or based on any action taken by the General Manager in furtherance of this Agreement." Based on these facts, we conclude that the trial court's findings that Theater Now was Corto's agent and was entitled to indemnification under the management contract for its costs and attorney's fees related to the National litigation, are amply supported by the record.

### Personal liability

■ National sued West Productions Limited Partnership and served Corto in her

---

15. D.C.Code § 16–520 provides:
   A defendant, any garnishee, party to forthcoming undertaking, or an officer who might be adjudged liable to the plaintiff by reason of the undertaking being adjudged insufficient, or *a stranger to the action who may make claim to the property attached, may file* an answer defending against the attachment.
   D.C.Code § 16–523 provides:
   Any person may file *his* motion and affidavit in the cause, at any time before the final disposition of the property attached or its proceeds, except where it is real property, setting forth 'a claim thereto or an interest in or lien upon the

same, acquired before the levy of the attachment. The court, without other pleading, shall try the issues raised by the claim, with a jury if either party so requests, and make all orders necessary to protect *any rights of the claimant.* [Emphasis added.]

16. In her reply brief, Corto appears to concede that she cannot assert the secured creditors' liens, referring to the fact that the creditors are now represented by counsel. The secured creditors have not appeared in this appeal through counsel or *pro se.*

capacity as partner and also sued and served Corto in her individual capacity. The trial court concluded that because West Productions was not formed as a limited liability partnership, and because Corto signed the agreement with National, Corto was personally liable on the contract to National. Corto argues that National's contract was with West Productions, not with her personally, and that the lawsuit could not proceed against Corto as a partner because National did not name all the partners of West Productions. Corto agrees that no limited partnership was formed, but claims that West Productions was not, as its name implies, a limited partnership, but a "general partnership," consisting of Corto and Francine Le-Frak, which operated under the trade name "West Productions Limited Partnership." [17] Whether West Productions was intended to be a limited or a general partnership, the trial court's ruling is correct. Because it is undisputed that no limited partnership was formed, if Corto signed the contract for a non-existent partnership, she was personally liable. *See Resnick v. Abner B. Cohen Advertising, Inc.*, 104 A.2d 254, 255 (D.C.1954). If, as Corto, argues, she signed the contract with National on behalf of a general partnership, that fact was not disclosed; therefore, Corto was personally liable. *Id.* [18]

### Settlement

■ Lastly, Corto contends that National's lawsuit against her should have been dismissed when National settled with Theater Now and Ralph Roseman. Corto's argument fails because in their Settlement Agreement, National and Theater Now expressly reserved their rights to file claims against Corto. Corto also argues that she and Theater Now were jointly liable to National. However, National also claimed that Corto was personally liable to National. Moreover, since the settlement did not provide any monetary relief to National, it cannot be interpreted as a release of Corto's

contractual liability for damages. *See Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 734 (D.C.1987). Thus, Corto remained liable on the contract to National.

*Affirmed.*

---

**17.** We note that this argument is inconsistent with Corto's assertion, discussed *supra*, that the box office receipts payable to West Productions under the production contract with the Kennedy Center were wages payable to Corto for personal services.

**18.** We will not countenance Corto's argument that she did not authorize the agreement between West Productions and Theater Now, as Corto's signature appears on the agreement's signature block on behalf of West Productions.